IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,

v.

JAMES WILLIAM LEWIS.

CR No. 0:14-362-JFA

**MEMORANDUM OPINION, & ORDER**

This matter is before the court on defendant's *pro se* motions for a reduction in his sentence pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A) (ECF Nos. 153, 155). Arguing extraordinary and compelling reasons, the defendant contends that he has a serious medical condition that could be threatened by the COVID-19 pandemic. He also argues that his "stacked" sentence based upon his conviction under 18 U.S.C. § 924(c) is an additional ground for relief and requests immediate release. For the reasons which follow, the motions are denied.

## I.    PROCEDURAL HISTORY

The facts of the defendant's crimes are particularly abhorrent. On December 12, 2013, the defendant, James William Lewis, participated in an armed robbery of a Jack in the Box restaurant in Charlotte, North Carolina where he had been employed in the past. While in the store, Lewis accosted the night manager, requested money, and made the statement, "Don't make me shoot you. I don't want to shoot you." Although the manager never saw the defendant with a gun, Lewis

1

indicated that he had a gun in his possession. A later review of the restaurant security cameras revealed that Lewis pulled the handgun and brandished it while the manager had his back turned, so that he likely did not see the weapon. Lewis subsequently took the cash and left the restaurant.

Lewis was thereafter charged with the Jack in the Box robbery and a warrant was issued for his arrest.[1] State law enforcement officials contacted the Motel 6 in Charlotte, where Lewis had previously worked, and the manger there identified Kirstie Barratt, another former employee, as one of Lewis's associates. Upon investigation, officers determined that Barratt and her parents resided in Fort Mill, South Carolina (just across the border from North Carolina) and made plans to speak with Barratt on January 7, 2014.

On that date, in the early morning hours, FBI Task Force Officers (TFO) Shane Page and Brent Koeck, accompanied by three Charlotte-Mecklenburg Police Department (CMPD) Violent Crime Apprehension Team (VCAT) members, and four York County South Carolina Sheriff's Office (YCSO) deputies, traveled to the Barratt residence in Fort Mill. For approximately 25 minutes, law enforcement officers repeatedly knocked on the door, made verbal requests through an open bedroom window, and used a police bull horn in an attempt to persuade Barratt to

---

[1] The restaurant manager recognized the defendant as a former employee who worked there from 2006 to 2013.

answer the front door.  Barratt ultimately opened the door at approximately 6:37 a.m. and advised the law enforcement officers that defendant Lewis was not in the residence, and that she had not seen him in approximately two weeks.  Barratt then provided verbal consent to conduct a cursory search of her residence.

The officers entered the residence and cleared the first floor.  Barratt's parents were then directed to come down the stairway from their second-floor bedroom to the first floor.  Barratt's mother complied, but Barratt's father was highly medicated and was unable to get out of bed.  Barratt's mother informed law enforcement that she last saw Lewis at the residence approximately one month earlier, but that he was not there at the present time.

TFO Page accompanied by CMPD VCAT officers Jeremy Towe and David Michaud proceeded upstairs to clear the two bedrooms.  As one of the officers engaged with Barratt's father in an effort to get him downstairs, other officers heard noises coming from another bedroom across from the parents' bedroom.  The door to the other bedroom was closed and Barratt advised that a pitbull dog was in that room.  Officers then requested Barratt to remove the dog from the room.  Barratt complied, going into the room and shutting the door behind her, and then exiting the room along with the dog.

The officers again asked Barratt if anyone was in the house and repeatedly informed her that she would likely go to prison if officers were injured.  Upon again

being told that the defendant was not present, Agents Page and Towe subsequently entered the bedroom and immediately encountered Lewis who was on the bed pointing a pistol at them. They immediately shouted, "Show us your hands!" Instead of complying, Lewis fired four shots using a .22 caliber handgun, with two of the rounds striking Page, one in his left shoulder and one in his abdomen/pelvic area. Page returned fire, firing four rounds from this .40 caliber duty weapon and struck Lewis twice, once in each leg.

During his arrest, Lewis advised the deputies that he wanted to die, and he wished that the officers had killed him. Barratt was also placed under arrest and charged with making a false statement to a Federal Agent, to which she later pleaded guilty.

After the shooting, Barratt revealed that Lewis was her boyfriend[2] and that he had come to her house around 1:00 a.m. the morning of the encounter and entered through a side door which was always open. Barratt disclosed that Lewis had told her that he robbed the Jack in the Box and threatened that he would put a "hit" on her and her family if she told on him. Barratt claimed that when she entered the

---

[2] From October 2012 until November 2013, Barratt was employed at the front desk of the Motel 6 in Fort Mill, S.C. She reported that she quit work to spend more time with her boyfriend, James William Lewis. (ECF No. 66, PSR at ¶ 48). Lewis also worked at the Motel 6 from March 2013 to October 2013 as a maintenance employee.

bedroom to retrieve the dog, Lewis pointed a gun at her and told her he would rather die than go to jail.

Upon being arrested at the Barratt home in Fort Mill, Lewis admitted robbing the Jack in the Box in Charlotte, N.C. on December 12, 2013, and taking approximately $1,200 in cash. During the FBI interview, Lewis indicated that he knew that the manager at the Motel 6 had told police that he was at Kirstie Barratt's house. Lewis made the following statement, "You can't do f*cked up sh*t to people and not expect consequences, so she can expect if he has to go to prison, then she is going to get hurt."

The defendant was indicted in the Western District of North Carolina on January 23, 2014 and charged with violating 18 U.S.C. § 1951 (interference with commerce by threats or violence) and 18 U.S.C. § 924(c) (knowingly and unlawfully use and carry a firearm in furtherance of such crime of violence, did possess and brandish said firearm). He pled guilty to those charges on May 16, 2014. He was sentenced on the N.C. charges on July 14, 2015 to 24 months on Count 1 and 84 months on Count 2, for a total of 108 months.[3]

On May 20, 2014, Lewis was also charged in the federal District of South Carolina in a two-count indictment with the following:

---

[3] See *United States v. James William Lewis*, CR No. 3:14-19-MOC (W.D.N.C.).

5

Count 1:    Assault on an FBI Agent by means and use of a firearm, in violation of 18 U.S.C. § 111(a)(1) and 111(b); second or subsequent offense, in violation of 18 U.S.C. § 924(c)(1)(A)(iii);

Count 2:    Knowingly using, carrying, and discharging a firearm during an in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(C); and discharging a firearm in furtherance of a crime of violence.

Significantly, for purposes of the motions presently before this court, at the time the defendant committed his offense in the District of South Carolina (January 14, 2014), his North Carolina federal charges had not yet become final. Although the North Carolina conviction was final before the South Carolina conviction, the North Carolina conviction was not final before the South Carolina violation.

The defendant ultimately entered a plea of guilty to Count 2 (firearm charge) pursuant to a written plea agreement (ECF No. 82). The plea agreement provided for the dismissal of Count 1 and a recommendation to state officials that the defendant not be prosecuted further for the shooting of the FBI Agent. The state charges were eventually dropped. The state prosecutors, in an email to the Assistant United States Attorney prosecuting this case, stated:

That is correct. Upon the imposition of the 25-year consecutive sentence, the matter will be concluded as far as we are concerned. The only way we would ever consider pursuing the charges after that would be if he [Lewis] were to have the 25-year federal sentence vacated on appeal or PCR. Thanks.

(ECF No. 174-3, email from [state court] Solicitor Kevin Bracket to Assistant U.S. Attorney Stacey Haynes dated August 19, 2015).

Based upon the offense to which the defendant was convicted, a second or subsequent violation pursuant to 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(c)(1)(C), the Presentence Report (PSR) indicated that the defendant's Guideline sentence was the minimum term of imprisonment required by the statute, which was not less than 25 years (300 months) incarceration, to run consecutive to any other term of imprisonment imposed. On January 20, 2016, this court imposed a sentence of 300 months consistent with the statute and the Guidelines. This sentence was to run consecutive to the sentence imposed in the District of North Carolina.

After an unsuccessful appeal and a collateral attack of his sentence pursuant to 28 U.S.C. § 2255, the defendant now returns to this court with a motion for compassionate release (ECF No. 155) in which he seeks immediate release from custody based on his medical condition and the ongoing COVID-19 pandemic. His current anticipated release date is March 6, 2045.

In a separate compassionate release motion (ECF No. 153), the defendant seeks to have his sentenced reduced, relying on the recent decision of the United States Court of Appeals for the Fourth Circuit in *McCoy v. United States*, 981 F.3d 271 (4th Cir. 2020). The court will address both motions in this order.

## II. STANDARD OF REVIEW

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *See United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492 (4th Cir. 2020); *United States v. Martin,* 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *See Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. It was originally adopted as part of the Sentencing Reform Act of 1984.

On December 21, 2018, the First Step Act was signed into law. Broadly, the Act's goals were to reform federal prisons and sentencing laws to reduce recidivism, decrease the federal inmate population, and maintain public safety. The First Step Act also expanded the existing compassionate release provisions of federal law by allowing an inmate to move for compassionate release himself, rather than allowing only the Director of the Bureau of Prisons (BOP) to do so. The relevant portion of the First Step Act, codified at 18 U.S.C. § 3582(c)(1)(A), provides:

(c) Modification of an imposed term of imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction...and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission....

18 U.S.C. § 3582(c)(1)(A).

By its terms, § 3582(c)(1)(A) permits the court to reduce the defendant's term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if the court first finds that (i) extraordinary and compelling reasons warrant such a reduction; and (ii) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.  In addition, a district court may not grant a sentence reduction under § 3582(c)(1)(A) without considering the § 3553 factors to the extent they are applicable.  *United States v. Kibble*, 992 F.3d 326, 332 (4th Cir. 2021).

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit agreed with the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir.

2020) and found that there is, as of now, no "applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A)," and as a result, district courts are "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise." *McCoy*, 981 F.3d at 284 (citing *Brooker*, 976 F.3d at 230); *see also*, *Kibble*, 992 F.3d at 331.

A defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t). Also, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

In summation, when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court generally proceeds in three steps. *See United States v. High*, 997 F.3d 181, 185–86 (4th Cir. 2021). First, the court determines whether "extraordinary and compelling reasons" support a sentence reduction. Next, the court considers whether a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission. As noted previously in this order and as set out in *McCoy*, because there is no applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A), district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise. Finally, if the court finds

10

that extraordinary and compelling reasons warrant relief, the court must consider the § 3553(a) factors in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment. Even if the defendant meets the eligibility criteria for compassionate release, this court retains discretion as to whether to grant relief. *See* 18 U.S.C. § 3582(c)(1)(A) (providing the court *may* reduce the term of imprisonment) (emphasis added).

### Exhaustion of Administrative Remedies

Before a court may consider a defendant's motion for compassionate release, the defendant must have fully exhausted all of the administrative rights to appeal a failure of the Bureau of Prisons (BOP) to bring a motion on the defendant's behalf or the lapse of 30 days with no answer from the Warden after a request by the defendant, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). The government does not dispute that the defendant has satisfied this procedural requirement.

As it appears to this court that the defendant has fully exhausted his administrative remedies, the court will proceed to review the matter on the merits.

*Defendant's Medical Condition*

Regarding his medical condition, the defendant references only the ongoing COVID-19 pandemic and his Grave's disease[4] as a basis for reducing his sentence.[5]

The mere existence of the COVID-19 pandemic—which poses a threat to every non-immune individual in the world—cannot independently provide a basis for a sentence reduction or justify compassionate release. However, COVID-19 is certainly relevant to the court's analysis of a § 3582(c)(1)(A) motion for compassionate release. If a defendant has a chronic medical condition that has been identified by the Centers for Disease Control (CDC) as elevating an inmate's risk of becoming seriously ill from COVID-19, it is possible that such medical condition could satisfy the extraordinary and compelling reasons standard. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify

---

[4] "Graves' disease is an immune system disorder that results in the overproduction of thyroid hormones (hyperthyroidism). Thyroid hormones affect many body systems, so signs and symptoms of Graves' disease can be wide ranging. About 30% of people with Graves' disease show some signs and symptoms of Graves' ophthalmopathy. In Graves' ophthalmopathy, inflammation and other immune system events affect muscles and other tissues around a person's eyes. Graves' ophthalmopathy often appears at the same time as hyperthyroidism or several months later. But signs and symptoms of ophthalmopathy may appear years before or after the onset of hyperthyroidism. Graves' ophthalmopathy can also occur even if there's no hyperthyroidism." *See* https://www.mayoclinic.org/diseases-conditions/graves-disease/symptoms-causes/syc-20356240

[5] On page 2 of his motion, the defendant suggests that there exists "other" extraordinary and compelling reasons for a sentence reduction, but the defendant did not disclose what those reasons are. Presumably, those are set out in the second motion (ECF No. 153) seeking relief on his § 924(c) charge.

compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Rather, the threshold questions are whether the defendant has a particularized risk of contracting COVID-19 in prison and whether his medical conditions render him particularly susceptible to severe illness or death should he contract the virus. *See United States of America, v. Andre Youngblood*, No. 20-7836, 2021 WL 4167105, at *2 (4th Cir. Sept. 14, 2021) (citing *United States v. High*, 997 F.3d 181, 185 (4th Cir. 2021)).

With commendable candor, the United States Attorney has researched the defendant's record while incarcerated and advised the court of some additional medical issues which need to be addressed. The defendant's records at the BOP where he is housed reveal that he has been diagnosed with a disorder of his eyelids (which was resolved following surgery in April 2020); astigmatism; Grave's disease; and a thyroid disorder. From January 2021 through February 11, 2021, the defendant's only prescriptions were Ibuprofen as needed, the antidepressant Sertraline; and Refresh Optic Tears as needed. His medical records do not reference any pneumonia diagnosis as the defendant asserts in his January 14, 2021 letter to the court.

The government concedes that the defendant utilizes a wheelchair, but he has been observed at the BOP on occasion walking behind his wheelchair. As the government points out, none of the medical records show any increased risk of

severe illness due to Covid-19.[6] None of the defendant's medical conditions are identified by the CDC as increasing a person's risk for developing serious illness from COVID-19.

### *Defendant's Challenge to § 924(c) Stacked Sentence*

In § 403 of the First Step Act of 2018, Congress amended 18 U.S.C. § 924(c), which provides consecutive terms for successive § 924(c) offenses, does not apply unless a defendant had a previous, final conviction for a § 924(c) charge at the time of the offense. This effectively did away with the so-called "stacking" procedure that had been followed by the district courts across the country for many years. However, the First Step Act expressly provided that this change in the law was *not* retroactive.

In *McCoy*, *supra*, however, the Fourth Circuit Court of Appeals indicated that the former practice of stacking § 924(c) convictions could be considered in a fresh look at sentencing under motions brought pursuant to § 3582(a)(1)(C) of the First Step Act. In other words, the disparity between a previous sentence for "stacked" 924(c) charges and the sentence a defendant would now receive under the First Step Act amendments could be considered an "extraordinary and compelling" reason.

---

[6] The government sets forth a comprehensive discussion of the strenuous measures the BOP is taking to protect the health of the inmates in its charge and to mitigate the risks of COVID-19. In late December 2020, BOP facilities began receiving initial allotments of COVID-19 vaccines. According to the BOP, as of August 30, 2021, it has distributed more than 216,832 vaccines and administered more than 215,009 of them.

Although the facts and circumstances of the case are somewhat different, and the defendant's conduct here is more culpable than that of the *McCoy* defendants, it cannot be denied that the central holding of *McCoy* applies to this case.

In a supplemental response, the government has responded to the defendant's suggestion that his sentence should be reduced by virtue of the *McCoy* decision. When this document was received, the court entered an order giving the defendant an additional 21 days to reply to the government's supplemental memorandum. The court then granted an additional extension of 14 days. The defendant's response and numerous exhibits have been received and reviewed by this court.

*McCoy* was perhaps the most significant sentencing decision handed down by the Fourth Circuit in recent years.  In that decision, the Court discussed at length the changes related to sentences under § 924(c) prior to and subsequent to the First Step Act.  Specifically, prior to enactment of this landmark legislation, a conviction under § 924(c) was treated as "second or subsequent" (thereby triggering the 25-year mandatory minimum sentence) even if the first § 924(c) conviction was obtained in the same criminal case.  The First Step Act ended this practice known as "stacking" by clarifying that the 25-year mandatory minimum applies only when a prior § 924(c) conviction arises from a separate criminal case and has already become final. As summarized by the Fourth Circuit, "Under Section 403 of the First Step Act . . . the 25-year mandatory minimum is 'reserved for recidivist offender, and no longer

applies to multiple § 924(c) convictions obtained in a single prosecution." *McCoy*, at 275 (quoting *United States v. Jordan*, 952 F.3d 160, 671 (4th Cir. 2020)).

But, as noted by the Court, this change does not apply retroactively to sentences imposed before December 21, 2018 when the First Step Act became law. *Id.* The Court then held that notwithstanding the statutory language making the anti-stacking provision nonretroactive, defendants seeking sentencing reconsideration could use the First Step Act's changed sentencing law for 924(c) cases under the "extraordinary and compelling" standard applied in compassionate release motions. In *McCoy*, this application would have shortened the defendants' sentences by a full 30 years. And, for the reasons set forth in the *McCoy* decision, the Court held that the district court below had not erred when it reduced the sentences of all four of the defendants to time served.

As stated above, the central holding of *McCoy* appears to apply to the instant case. The defendant's 25-year mandatory consecutive sentence was imposed by this court when stacking was still required by the statute. If sentenced today, however, the defendant's mandatory minimum would be different. This is because the federal charges in the Western District of North Carolina (Hobbs Act robbery and a § 924(c) count) had not become "final" when the defendant committed the crime in this case in the District of South Carolina. In other words, for the two §924(c) convictions to be stacked, the defendant's December 2013 crime in N.C. at the Jack in the Box

16

would have to have occurred and been adjudicated prior to January 14, 2014—the date he committed the crimes at the Barratt's house in S.C. Instead, the defendant's N.C. crimes occurred just one month prior to his S.C. crimes. So, although the defendant was sentenced for his N.C. crimes *before* he was sentenced in S.C., the N.C. crimes were not considered "final" for stacking purposes. Thus, stacking would not be allowed, and defendant's statutory sentence in this district for discharging a firearm during a crime of violence would be a mandatory minimum of 10 years (not 25) with a maximum of life. If a PSR was prepared today, it would suggest a Guideline sentence of 10 years, the minimum set forth in the statute.[7]

But to say that the central holding in *McCoy* overlaps with defendant's claims here is not dispositive of the issue. The Fourth Circuit in *McCoy* went to great lengths to emphasize particular circumstances presented in that case and, on more than one occasion, noted that the sentence reductions approved in that case were the product of "individualized assessments" of each individual defendant's sentence. *Id*. at 286.[8]

Quoting from *United States v. Bryant*, Cr. No. 95-202-CCB03, 2020 WL 2085471, at *5 (D. Md. Apr. 30, 2020) the court stated that "it is not unreasonable for Congress to conclude that not *all* defendants convicted under § 924(c) should

---

[7] This court does not address the question of whether the defendant is entitled to relief on his North Carolina federal sentence under *McCoy*. That issue is not before this court.

[8] Indeed, the Fourth Circuit stressed the need for "individualized assessment" of each sentence twelve times in the opinion. *McCoy* at 274, 275, 277, 278, 279, 280, 286 (twice), 287, and 288 (twice).

receive new sentences, even while expanding the power of the courts to leave *some* defendants of those sentences on a case by case basis." (emphasis in original). The Court further explained, "there is a significant difference between automatic vacatur and resentencing of an entire class of sentences— with its 'avalanche of applications and inevitable re-sentencings,'—and allowing for the provision of individual relief in the most grievous cases." *Id*. at 286–87 (quoting *United States v. Haynes*, 456 F. Supp. 3d 496, 516 (E.D.N.Y. 2020)).

From the foregoing, it is clear that the *McCoy* decision authorizes,[9] but does not require, this court to "unstack" the § 924(c) sentence that was appended as a consecutive sentence to the Hobbs Act robbery sentence imposed in the District of North Carolina.

With this principal established, the court turns to the specific facts in the defendant's case to provide the individualized assessment called for in *McCoy*. First, it cannot seriously be argued that the defendants in *McCoy* were similarly situated to the defendant here. McCoy was only 19 years old at the time of the commission of his crime and his only prior conviction was for reckless driving. In the three other cases, the defendants were between 22 and 24 years old at the time of their offenses.

---

[9] This court has not hesitated to apply *McCoy* and enter substantially lower sentences when the facts of the individual case called for such a reduction. *See*, *e.g*., *United States v. Dyches*, Cr. No. 8:06-136-JFA (order entered August 9, 2021, ECF No. 335, reducing the defendant's sentence by 164 months by "unstacking" multiple § 924(c) convictions).

One of those defendants had no criminal history and another had one minor prior conviction for which he served no jail time.

Here, Lewis was nearly 32 years old at the time of the commission of his crimes. By way of further contrast, Lewis had on his record a 1999 conviction for possession of cocaine at age 16; a 1999 conviction for larceny of a motor vehicle at age 17; and the aforementioned Hobbs Act robbery in North Carolina in 2013. The defendant's criminal history category was III.

All of the defendants in *McCoy* had received sentences of 45 years. Each defendant had served approximately 25 years in prison. Here, Lewis' sentence was 25 years and he has served only 7 years (approximately 28%) of his sentence. The then-applicable stacking regime in *McCoy* increased the defendants' sentences by 30 years. The increase prescribed for the defendant in this case was only 15 years.

In discussing the actual crimes committed in the "Bryant wing" of the *McCoy* decision, the Court noted that although the defendants were convicted of armed bank robbery, none of those robberies resulted in any injuries. There is no indication whether *McCoy*'s victims were injured in the § 924(c) counts for which he was convicted. In this case, however, FBI TFO Shane Page was struck twice, once in the left shoulder and once in the abdomen/pelvic region. Page suffered significant injuries and has some residual disability.[10]

---

[10] The PSR indicates that Agent Page did not seek restitution.

The *McCoy* Court emphasized the defendants' post-sentencing conduct and rehabilitation. Here, the defendant's disciplinary record is blemished. He has three disciplinary violations for which he was convicted, to wit: (1) refusing a drug/alcohol test in 2018; (2) possessing a non-hazardous tool in 2017; and most importantly; (3) possessing a dangerous weapon on March 5, 2018.[11]

The court would note that Lewis has availed himself to numerous education and vocational courses while incarcerated. Defendant's filings included several certificates of completion including courses involving anger management; drug abuse; and freedom from drugs. Additionally, Lewis has taken courses in painting, drawing, recreation facilities, creative writing, and attended a job fair. These programs ran for between one day (the job fair) to two months (the drawing class) in duration.

One of the *McCoy* defendants had paid nearly $10,000 towards a restitution order of $38,029. Here, the injured FBI agent did not seek restitution, nor has Lewis paid any on a voluntary basis.

## IV. ANALYSIS

With this background, the court now turns to the ultimate question of whether the defendant's medical condition and the anti-stacking authorization of *McCoy*, together with this court's individualized assessment of the defendant's crimes, call

---

[11] The possession of a dangerous weapon is a level 100 code which is deemed the most severe.

for a sentence of time-served as requested by the defendant. For the reasons which follow, the court concludes that it does not.

*Defendant's Medical Condition*

All of the defendant's medical conditions identified earlier in this opinion appear to be under control and appropriately treated with medication and care. Although the defendant is confined to a wheelchair after he was shot by an FBI agent for first shooting the agent, he has on occasion been seen walking behind his wheelchair. None of the defendant's medical records show any inability to care for himself while in the BOP or an increased risk of contracting serious illness when considered alongside the Covid-19 pandemic. Although Grave's disease is an autoimmune disorder, it is not one of the conditions identified by the CDC as increasing a person's risk for developing serious illness from COVID-19.

The Government further asserts that, currently, the CDC lists "immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines" as a condition that "might be at an increased risk for severe illness from the virus that causes COVID-19." Graves' disease is an autoimmune disorder, so there could be an argument it fits within the catchall. However, a district court recently analyzed that argument and held that it does not appear to do so. *See United States v. Iribe*, 2021 WL 347692, at *3–4 (S.D. Cal. Feb.

2, 2021)(Graves' disease does not fall within conditions set forth by CDC). Given that the defendant has adequately controlled his Grave's disease for over 20 years and this condition is not specifically refenced in CDC guidelines, the court determines that he has failed to show it constitutes and extraordinary and compelling circumstance.

*Defendant's 924(c) Sentence*

Next, the defendant asserts that, apart form his medical conditions, his prior §924(c) sentence alone presents an extraordinary and compelling reason to qualify him for compassionate release.

The *McCoy* Court stressed the "severity of [the] § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence that a defendant would receive today." *Id.* at 285. If the defendant were sentenced by this court at the present time, the statutory provision would be a mandatory minimum sentence of 10 years with a maximum of life, as opposed to the stacked sentence of 25 years he actually received. Although the Guideline sentence would be 10 years, the mandatory minimum called for by the Guidelines, this court would not be compelled to impose a Guideline sentence. If sentenced today, this court would have the discretion to depart upward to a sentence that more adequately reflects the seriousness of the crime committed in this case. And, after due reflection after all of the facts and circumstances in this case (including the fact that the serious state

22

charges were dismissed in anticipation of the defendant receiving a substantial federal sentence), this court has little hesitation in concluding that if the defendant were being sentenced today, with the Guideline and statutory provisions indicated above, this court would impose an upward departure to a sentence of 25 years.

A departure above the mandatory minimum for § 924(c) convictions is expressly authorized by the Guidelines. See U.S.S.G. § 2K2.4 app. Note 2(B). Title 18 U.S. Code § 924(c) provides for a graduated scale of mandatory minimum sentences depending upon whether the firearm was possessed (5 years), brandished (7 years), or discharged (10 years). There is no provision to provide for an additional penalty if the discharge of the firearm wounds a law enforcement officer in pursuit of a felon. Moreover, the shots fired at FBI Agent Page were not fired in the heat of battle, or by sudden impulse. Rather, they were the product of a cold and calculated attempt by a fugitive to maintain his freedom or commit suicide by cop. By coercing his girlfriend and her mother to mislead the pursuing officers, and by lying in wait for an officer merely doing his job attempting to apprehend a fugitive accused of a violent robbery, the defendant committed a most heinous crime. This court has little difficulty in concluding that had the defendant been sentenced today, an upward departure to a sentence of 25 years would be imposed.

Therefore, given the vast factual differences in Lewis' criminal case and those presented in *McCoy*, along with this court's conclusion that an upward variance

likely would have been imposed, the court does not find that Lewis' 924(c) sentence in this action constitutes an extraordinary and compelling reason sufficient to warrant compassionate release.

*Factors under 18 U.S.C. § 3553(a)*

More importantly, even if the court were to conclude that the defendant has demonstrated an "extraordinary and compelling" reason for compassionate release, this court would nevertheless exercise its discretion not to disturb the defendant's sentence based upon a review of the 18 U.S.C. § 3553(a) factors. *United States v. High*, No. 20-7350, 2021 WL 1823289 (4th Cir. May 7, 2021)("In any event, if a court finds that a defendant has demonstrated extraordinary and compelling reasons, it is still not required to grant the defendant's motion for a sentence reduction. Rather, it must consider the § 3553(a) sentencing factors to the extent that they are applicable in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment.")(cleaned up).

After carefully considering the facts of this case and the defendant's prior record, the court concludes that the defendant would present a danger to the community if released now. In doing so, the court has carefully analyzed and applied all of the § 3553(a) factors to conclude that the defendant's sentence is sufficient, but not greater than, necessary to serve the statutory purposes of sentencing. The

court will thus proceed to set out its explanation with regard to the § 3553(a) factors in order.

1.    *Nature and Circumstances of the Offense.*  It cannot be gainsaid that the defendant's crime was a most serious one.  Shortly after an armed robbery of a restaurant, the defendant took flight and, in the process, threatened his girlfriend and her parents with physical harm if they cooperated with authorities.  After law enforcement entered the home of his girlfriend Kirstie Barratt, when Barratt entered the bedroom to retrieve her dog, the defendant made eye contact with her and again threatened her, telling her not to disclose to officers that he was present in the room. Secure with the knowledge that the officers would probably not expect to encounter him in the room, the defendant carefully laid in wait and then, when the agent entered the room, fired two shots at an FBI agent which found their mark.  The struck officer received painful and disabling injuries.  Suffice it to say that the defendant did not merely have a firearm present at the time of his crime.  Not only did he brandish it, he discharged it striking an officer.

2.    *History and Characteristics of Defendant.*  As noted previously, the defendant's personal circumstances are quite different from either of the *McCoy* defendants.  Lewis had three criminal convictions on his record, resulting in a criminal history category of III.  He committed the instant offense shortly after committing an armed robbery in North Carolina.  He threatened at least three

individuals with bodily harm in the event that they cooperated with authorities. He suggested to the North Carolina restaurant proprietor that the he "not make [him] shoot him."

By coercing his girlfriend into assisting with his attempt to avoid arrest, he directly caused her to be charged with making false statements to a federal agent in violation of 18 U.S.C. § 1001. She entered a plea of guilty and received a 24-month sentence on December 16, 2014. *See United States v. Barratt*, CR No. 0:14-362-JFA (D.S.C.).

Subsequent to sentencing, the defendant has taken some vocational and educational courses. These courses included several drug education courses as well as many emotional and psychological treatments. Defendant avers that rehabilitation efforts have resulted in immeasurable progress which should warrant some relief. However, he has three disciplinary infractions on his record, including possession of a dangerous weapon while in the BOP. The Court applauds Lewis' rehabilitation efforts. However, a defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t).

In addition, this court has reviewed and refreshed its recollection on the defendant's life history, which is most tragic. As is all too often the case, the defendant was the product of a troubled upbringing with abusive and absent parents, he began experimenting with controlled substances at a very young age; and,

although not mentally ill in a legal sense, he has had some challenges during his life. At times he was homeless.

3.  *Seriousness of the Crimes*.  As noted, this court regards the defendant's crimes as very serious, fully supportive of a significant sentence.

4.  *Whether the Sentence Promotes Respect for the Law and  Just Punishment for the Offense*.  The court finds a significant sentence is necessary to promote respect for the law and just punishment. This is especially true considering the defendant's violent actions were directed at law enforcement officers.

The Court would also note that, throughout his filings, defendant infers that the prosecutors in his South Carolina case somehow conspired with the prosecutors in his North Carolina case[12] to orchestrate a string of charges which would result in an unnecessarily lengthy sentence. Defendant fails to realize however, that several of his charges were dismissed by these prosecutors who also conferred with state agencies to ensure state charges would also be dropped. Defendant's baseless allegations of prosecutorial misconduct clearly illustrate the continued need to promote respect for the law. Defendant's original punishment remains just for the offenses, especially considering the windfall Defendant experienced when a multitude of related charges were dismissed.

---

[12] Additionally, some of the defendant's filings, accusing the prosecutors of misconduct, bespeaks a lack of remorse for his crimes.

5.    *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*. The court finds that a significant sentence is necessary to provide both general and specific deterrents.

6.    *Whether the Sentence Protects the Public from Future Crimes of the Defendant*.  The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant.

7.    *Need to Avoid Unwarranted Sentencing Disparities*.   There were no co-defendants in this case with which to compare the defendant's sentence.  However, a 25-year sentence is not out of line with other defendants who have successfully fired weapons and struck law enforcement officers.

## V.  CONCLUSION

For all the foregoing reasons, the court concludes that the defendant has not demonstrated an extraordinary and compelling reason for relief under § 3582(c)(1)(A) due to his medical conditions or the *McCoy* decision regarding § 924(c) charges.

Moreover, even if the court were to conclude that the defendant has demonstrated an extraordinary and compelling reason for release based upon his medical conditions and *McCoy*, this court would nevertheless decline to modify his sentence because of the court's firm conclusion that the defendant's release would pose a danger to the community.  The court reaches this conclusion after carefully

considering the individualized circumstances of the case, as reflected in the §
3553(a) factors, and as supplemented by the defendant's record while incarcerated.

IT IS SO ORDERED.

October 5, 2021                          Joseph F. Anderson, Jr.
Columbia, South Carolina                 United States District Judge